UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JENNAYA BENNETT-WERRA, )
)
    *PLAINTIFF,* )   Civil Action No. 1:20-cv-10017-ADB
)
V. )
)
)
STEVEN TOMPKINS, et al., )
    *Defendants.* )

-------------------------------------

### **PLAINTIFFS' MEMORANDUM IN SUPPORT OF MY MOTION OF OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

1.      I, plaintiff Jennaya Bennett-Werra, acting as pro se, respectfully ask that the court uphold my amended complaint against defendants Steven Tompkins, Yolanda Smith, Zezinha Mitchell, Christina Ruccio and Jennifer Sullivan.

### **INTRODUCTION**

2.      I, Jennaya Bennett-Werra, am a pro se litigant currently incarcerated at Suffolk County H.O.C.. I am a transgender women as stated in my complaint. I have filed this lawsuit against defendants Steven Tompkins, Yolanda Smith, Zezinha Mitchell, Christina Ruccio and Jennifer Sullivan. I have also named Naphcare Inc. and they have separate council. The main cause of this action is due to fact that defendants do not treat me equally to all other females held at Suffolk County H.O.C., which is discrimination on the basis of my disability. *see amended complaint ¶ 1,30,37,40,49,52,61 and 6.* Defendants, however claim that "the crux of the plaintiff's complaint is: that she is not being housed in the women's unit at the SCHOC, which has put her in jeopardy for sexual assaults:" *see Defendants' memorandum in support of their motion to dismiss the plaintiff's complaint DOC. No. 33 page 1-2.* This is their wrongful interpretation of my amended complaint, *see amended complaint section IV prayer for relief(b)(1).* This is just one of the many reasons of why judgment should be issued in my favor in this motion for dismissal stage. I most certainly have stated multiple claims in which relief can be granted and will make that argument in the proceeding paragraphs of this here memorandum of law.

# ARGUMENT

## I. THE COURT SHOULD DENY DEFENDANTS' STEVEN TOMPKINS, ET AL., MOTION TO DISMISS.

### A. Standard of Review.

3.  In considering a motion to dismiss, a court must take the "factual allegations in the complaint as true and make all reasonable inferences in plaintiff's favor." *Mississippi Pub. Employees' Ret. Sys. V. Boston Sci.,* 523 F. 3d 75, 85 (1st Cir.2008); *see* also Bell Atlantic v. Twombly, 550 U.S. 544, 555-56 (2007). A Rule 12(b)(6) motion tests the sufficiency of the complaint against the pleading requirements or federal rule 8(a). Rule 8 (a)(2) merely requires a complaint contain a short and plain statement of the claim showing that the pleader is entitled to relief, " in order to give defendant fair notice of what the… claim is and the grounds upon which it rests." *Twombly,* 550 U.S. at 555. " stating such a claim requires a complaint with enough factual matter (taken as true) to suggest the required element." Id. at 556. A complaint may not be dismissed merely because it appears unlikely that the plaintiff can prove those facts or will ultimately prevail on the merits. *See* id. at 554-55, 563 n.8; *Zond v. Fujitsu Semiconductor, 990* F. supp.2d 50, 53 (d.mass.2014) ("at the motion to dismiss stage a complaint generally will only be dismissed where it is 'entirely implausible' or impossible for the grouped defendants to act as alleged").

### B. Plaintiff States a Claim of Disability Discrimination Under Title II of the ADA and § 504 of the FRA in Counts I and II of the Complaint.

4. Title II of the ADA provides that:

> Subject to the provisions of this subchapter, no qualified individual with a disability shall, by any reason of such disability, be excluded from participation in, or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity. 42 U.S.C. § 12132.

5. The substantive provisions of Title II and §504 of the FRA of 1973, 29 U.S.C.§ 794, are similar. Section 504 provides:

> No otherwise qualified individual with a disability in the United States… shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance…

6.  28 U.S.C.§ 794(a). The standards of liability under the FRA are identical to those under the ADA, and thus the claims are usually analyzed together. *See, e.g., Nat'l Ass'n of the Deaf v. Harvard Univ.,* 2016 WL 3561622, at *4 (D. Mass. Feb. 9, 2016), *report and recommendation*

*adopted,* 2016 WL 6540446 (D. Mass. Nov. 3, 2016). There is no dispute that these standards apply to state prisons. *Pa. Dep't of Corr. v. Yeskey, 524 U.S. 206, 209-210(1998).*

7. To state a claim under the ADA, a plaintiff must establish "(1) that (s)he is a qualified individual with a disability; (2) that (s)he was either excluded from participation in or denied the benefits of some public entity's, services, programs, or activities or was otherwise discriminated against; and (3) that such exclusion, denial of benefits, or discrimination was by reason of the plaintiff's disability." *Cox v. Massachusetts Dep't of Corr.,* 18 F. Supp. 3d 38, 48-49 (D. Mass. 2014) (quoting *Parker v. Universidad de Puerto Rico, 225 F. 3d 1, 5 (1st Cir.2000).*

### 1. Plaintiff is a Qualified Individual with a Disability Under the ADA and FRA.

8. Defendants do not contest that I am a qualified individual with a disability under the ADA and FRA, *see doc. 33 Defendants' Memorandum in support of motion to dismiss,(page, 7).*

### 2. *I Have Sufficiently Pled That I Have Been Subjected to Discrimination Under Title II of the ADA and § 504 of the FRA.*

9. *Title II and § 504 contain broad, all-encompassing prohibitions of discrimination by public entities. See 42 U.S.C. § 12132; 29 U.S.C. § 794(a). Contrary to Defendants' assertion, I need not identify a specific program, activity or service from which I was excluded to state a claim.* "The language of Title II's anti-discrimination provision does not limit the ADA's coverage to conduct that occurs in 'programs, services, or activities' … It is a catch-all phrase that prohibits discrimination by a public entity, regardless of context." *See Innovative Health Systems v. City of White Plains,* 117 F.3d 37, 44-45 (2d Cir. 1997), *superseded on other grounds by Zervos v. Verizon N.Y., 252 F.3d 163, 171 n.7 (2d Cir. 2001). See also Noel v. N.Y. City Taxi & Limousine Comm'n, 687 F.3d 63,68 (2d Cir. 2012)* ("The phrase 'services, programs, or activities' has been interpreted to be 'a catch-all phrase that prohibits all discrimination by a public entity.'"); *Hason v. MED. Bd. Of California,* 279 F.3d 1167, 1172-73 (9th Cir.2002) ("The ADA's broad language brings within its scope anything a public entity does.") *Yeskey v. Com. of Pa. Dep't of Corr.,* 118 F.3d 168, 170-71 (3rd Cir. 1997), *aff'd sub nom, Pa. Dep't of Corr. V. Yeskey, 524 U.S.C. 206,210 (1998)* (stating that "the statutory definition of 'program or activity' in Section 504 indicates that the terms were intended to be all-encompassing," and broadly interpreting Section 504 and Title II of the ADA to apply to anything a public entity does").

10. I have asserted facts supporting three separate theories of liability. First, I have pled sufficient facts to show that I was "subjected to discrimination … by reason of my disability (Gender Dysphoria)" under the statutory prohibition of disparate treatment. I am a women with Gender Dysphoria. All women- except those with Gender Dysphoria- are housed in the women's unit. This is plainly Discrimination "by reason of" my Gender Dysphoria. *See, e.g., Henderson v. Thomas,* 913 F. Supp. 2d 1267, 1276 (M.D. Ala.2012) (determining that Alabama Department of

2

Corrections excluding HIV-positive inmates from all prison and work-release facilities except for one violated the ADA and FRA.).

11. Further, because of having and receiving treatment for Gender Dysphoria, I am a women, have a female gender identity and a female body. I have alleged a set of facts by which I will be able to show that I have female breast, body fat distribution consistent with that typically associated with females, a feminized voice from the impact of hormones on my vocal chords, softened skin, and diminished body hair. As a result, I am treated disadvantageously relative to other inmates who do not suffer from Gender Dysphoria. For example, being housed on a male unit subjects me to sexual harassment, and the risk of sexualized violence. Other female inmates who do not have Gender Dysphoria are not subjected to these same experiences because they are never housed on any male unit. For this reason, I can show disparate treatment because of my Gender Dysphoria.

12. Second, I stated a claim that defendants' criterion for gender based housing classifications, based on a person's assigned sex or genitals has a disparate impact on inmates with Gender Dysphoria whose treatment plans do not include genital surgery. The language and legislative history of Title II prohibits policies or practices that have the effect of discriminating against an individual with a disability. A classification and treatment rule based on assigned sex at birth or genitals undermines the medical needs of inmates with Gender Dysphoria by forcing them into an environment in which every aspect of their lives is contrary to their prescribed treatment. Further, it forces an individual like me to endure overt sexual abuse and harassment, and the risk of sexual assault, because males in a gender-segregated setting view me as a sexual object. The same classification rule does not similarly adversely affect individuals without Gender Dysphoria who are placed in a unit, unlike me, consistent with their gender identity and lived experiences as men or women.

13. Third, I have sufficient facts that I have been denied reasonable accommodations for my Gender Dysphoria. Title II regulations require a public entity to "make reasonable modifications in policies, practices, or procedures when the modification are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 1614.203(d)(3). A plaintiff states a claim for a denial of reasonable accommodation when she alleges facts to show that the prison has refused to alter some prison policy or practice that result in interference with an inmate's medical treatment. For example, in *Lonergan v. Fla. Dep't of Corr.*, 623 F. App'x 990,991 (11th Cir.2015), a dermatologist ordered that an inmate with pre-cancerous skin lesions be provided a hat, sunblock, and be kept out of the sun. Plaintiff requested, inter alia, a transfer to a prison where no required activities are conducted outdoors in the sun. Id. the Eleventh Circuit reinstated plaintiff's "reasonable accommodation" claim, noting in the ADA context, "A prisoner's transfer from or to a particular prison may become relevant when prison officials attempt to determine what constitutes a 'reasonable accommodation'." Id. at 993-94.

3

14. I have alleged denial of reasonable accommodations necessary to my medical care including being housed on a female unit ( although I have been currently housed on a female unit since April 17th ,2020), referred to using my female name and female pronouns and most importantly being treated equally to all other females held at Suffolk County H.O.C.

15. Defendants claim that they have made numerous reasonable accommodations for my disability. Although they have failed to make the very most important accommodation that would insure my safety. In turn defendants have subjected me to some very serious situations that should have been foreseen by the defendants and could have been avoid if I was reasonably accommodated for my disability within a reasonable amount of time. Defendants did not move me to a female unit until I had been housed on numerous male units for over a year. During this time I have had serious troubles with my safety on male units. Very much unlike the "day-to-day prison life" of all other women held at Suffolk County H.O.C. . Defendants' main contestant to my ADA claims is that they made numerous **other** accommodations but not the single most accommodation that would insure my safety and prevent discrimination.

> Title II of the ADA provides that:
>
> Subject to the provisions of this subchapter, no qualified individual with a disability shall, by any reason of such disability, be excluded from participation in, or be denied the benefits of the services, programs, or activities of a public entity, **or be subjected to discrimination by any such entity.** 42 U.S.C. § 12132.

16. Defendants' sole defense is that they have made **some** reasonable accommodations for my disability but they agree that I was not initially housed on a women's unit. Just because defendants have made some reasonable accommodations other than the very most accommodation I requested numerous times does not entitled the defendants to dismissal of my ADA and Rehabilitation Act claims. Even though defendants have moved me to a women's unit as of April 17th, 2020 does not mean that no further relief can be granted. The Supreme Court has held that prisoners can recover damages for ADA violations that are also violations of the Constitution. *See U.S. v. Georgia,* 546 U.S. 151, 155-60,126 S. Ct. 877 (2006).

17. In this case, simply put as, Defendants failure to house me in a female unit for over a year and there claim that I could not be housed on such unit initially, did so discriminate against me because of my disability due to the fact that no other women held at Suffolk County H.O.C. are housed on male units to "ensure that they could assimilate with other women at the jail". Defendants' also suggest that my case is dissimilar to *Doe v. Massachusetts Department of Correction,* No. 17-12255-RGS, 2018 WL 2994403 (D. Mass. June 14, 2018) because they allow me some reasonable accommodations but not the very most accommodation that would ensure my safety and prevent discrimination, also defendants' claim my case is different from *Doe's* because I have had multiple disciplinary reports. Although the first disciplinary report I had received was on September 5th, 2019 and was a result of a female inmate handing me a letter for

4

a male inmate that I was housed on the same unit with, before this very minor incident I had gone about five months with no disciplinary actions against me all while requesting to be housed on a female unit. It does not make much sense that defendants' would use this issue as part of their defense because many of the women that do not suffer from Gender Dysphoria have very similar or worst disciplinary actions against them and they are not house on male units because of their disciplinary records. This is just another example of the discriminations that I face with the administrations at Suffolk County Sheriff's Department. I ask that the court move forward with counts I and II of my amended complaint.

### 7. I have stated a Claim for a Violation of Equal Protection under the Fourteenth Amendment in count III of the complaint.

18. My complaint alleges sufficient facts to support an equal protection claim in at least two ways. First, I have alleged facts to show that all women held by Suffolk County H.O.C. without Gender Dysphoria or who are not transgender are housed on female units. I have also alleged sufficient facts to show that incarcerated individuals without Gender Dysphoria or who are not transgender are not subjected to the kinds of sexual harassment, violation, and indignities that result from being a transgender inmate housed exclusively based on an individual's birth sex or genitals without regard to the person's gender identity or the fact of having under gone a gender transition.

### 8. I stated a claim for a Violation of Due Process Under the Fourteenth Amendment in count IV of the Complaint.

19. My allegations also properly state a claim for violations of procedural and substantive due process. First, my liberty interest in not being housed on a men's unit, with constant affront to my very existence and the unique unending risk of harm that such confinement entails, gives rise to a procedural due process claim. State regulations create a liberty interest if they impose a form of restraint that represents an "atypical and significant hardship on the inmate in relation to the normal incidents of prison life." *Sandin V. Conner*, 515 U.S. 472, 484 (1995). Such is undeniable the case here. The ongoing harms heightened potential for victimization that comes with being a women housed on a men's unit gives rise to a liberty interest, particularly where such placement in indefinite, where my placement in the men's unit is not necessary for safety. *See Wilkinson v. Austin*, 545 U.S. 209, 224 (2005) (indefinite placement in supermax facility, even if facility's conditions are necessary, gives rise to liberty interest in avoiding such placement).

20. Even if state regulations did not already create a liberty interest, I would still have one because the restraint in question – requiring me to be housed in a men's unit, where it is foreseeable that I would be openly discriminated against, harassed and threatened – clearly creates an "atypical and significant hardship" on me that so exceeds the "normal incidents of prison life" that it gives rise to due process protection by its own force. *Sandin*, 515 U.S. at 484. My confinement in a male facility implicates due process because of the atypical hardship it imposes on me and the departure it represents from experiences of other prisoners. *See id.* (citing cases finding due process protection in transfer to mental hospital or involuntary administration

5

of psychotropic medication to prisoner). The DOC's own policy acknowledges how unusual my circumstances are. *See* Massachusetts Department of Correction: Identification, Treatment and Correctional management of Inmates Diagnosed with Gender Dysphoria, 103 DOC 652, Att.B ("Risk of Victimization" factors on internal housing form include "Is or perceived to be Transgender, intersex, Gender Dysphoria..."). These policies are under medical care policies of the Massachusetts Department of Corrections. This is a factor to look closely at when deciding whether Defendants' rely exclusively on the determination of medical professionals.

21. Where there is a liberty interest, the question in a procedural due process claim is whether the process afforded to the plaintiff is sufficient. The Complaint firmly alleges that in my case, it is not. I am faced with an administration that has categorically rejected my request to be housed on a female unit for over a year.

22. Second, as alleged in the Complaint, the persistent sexual harassment and constant affront to my long-standing identity as a women that my experiences, as a direct result of my placement in a men's unit, subjecting me to a known increased risk of sexual harm and to intentionally place me in an environment that inherently denies me the identity-affirming treatment required by my Gender Dysphoria is the type of government action that is clearly improper "regardless of the fairness of the procedures" afforded to me. *Gonzalez-Fuentes v. Molina*, 607 F.3d 864,880 (1st Cir.2010) (quoting Daniels v. Williams, 424 U.S. 327, 331 (1986)). Government action violates substantive due process if it is "so egregious, so outrages, that it may fairly be said to shock the consciences." Id. (quoting County of Sacramento V. Lewis, 523 U.S. 833, 847 n.8 (1998)). Analysis of whether certain conduct shocks the conscience is fact-specific and unique to the circumstances of the particular case. Id. at 881. Because my complaint includes sufficient allegation to prove facts that support my claim, this Court should deny Defendants' motion.

## 8. ARGUMENT UNDER DEFENDANTS' QUALIFIED IMMUNITY DEFENCE.

23. Whether an official has qualified immunity will depend on the functions and responsibilities of the official claiming the immunity, As well as the purposes behind the Civil Rights Act. Section 1983 includes "misuse of power, possessed by virtue of state law and made possible only because the wrong- doer is clothed with the authority of state law." The court in Scheuer stated: *In varying scope, a qualified immunity is available to officers of the executive branch of government, the violation being dependent upon the scope of discretion and responsibilities of the office and all the circumstances as they reasonable appeared at the time of the action on which liability is sought to be based. It is the existence of reasonable grounds for the belief formed at the time and in light of all circumstances, coupled with good-faith belief, that affords a basis for qualified immunity of executive officers for acts performed in the course of official conduct. Id. at 247.*

24. The issue of qualified immunity arose in a school setting with respect to a working definition of "good faith" in *Wood v. Strickland* 420 U.S. 308 (1975). The Supreme Court established a two-pronged test based on "subjective" and "objective" good-faith determinations.

6

The Court held: *(Therefore, in specific context of school discipline, we hold that a school board member is not immune from liability for damages under § 1983 if he knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the student affected, or if he took the action with malicious intention to cause deprivation of constitutional rights or other injury to the student. That is not to say that school board members are "charged with predicting the future course of constitutional law." A compensatory award will be appropriate with such disregard of the student's clearly established constitutional rights that his rights that his action cannot reasonably be characterized as being in good faith. Id. at 322.*

25. Under the *Wood* test, the official involved must act sincerely, and with a belief that he or she is doing right. However, an act violating a constitutional right cannot be justified by ignorance or disregard of settled law. In other words, an executive official is held to a standard of conduct based not only on permissible intentions, but also on knowledge of the basic, unquestioned constitutional rights of the individuals for whom the official is responsible.

26. *Wood* was a five-to-four decision. The dissenting justices argued, in effect, that it is unsound to hold public officials liable for actions taken, without malice, that violated "unquestioned constitutional rights," when the Supreme Court itself cannot determine unanimously what those rights are. Justice Powell, writing for the dissent, stated: *(The Court states the standard of required knowledge in two cryptic phrases: "settled, indisputable law" and "unquestioned constitutional rights." Presumably these are intended to mean the same thing, although the meaning of neither phrase is likely to be self-evident to constitutional law scholars– much less the average school board member. One need only look to the decisions of this Court– to our reversals, our recognition of evolving concepts, and our five-four split–to recognize the hazard of even informed prophecy as to what are "unquestioned constitutional rights." Id. at 329.*

27. In *Procunier v. Navarette*, 434 U.S. 55 (1978), the *Wood* standard was applied to prison officials. The court ruled that, as prison officials, they were not absolutely immune from liability in the § 1983 damage suit and could only rely on qualified immunity as described in *Scheuer* and *Wood*. Using the first standard put forth in *Wood*, the court stated "…the immunity defense would be unavailable to prison officials if the constitutional right allegedly infringed by them was clearly established at the time of their challenged conduct, if they knew or should have known of that right, and if they knew or should have known that their conduct violated the constitutional norm."

28. Taking a new direction, the doctrine of qualified immunity was substantially changed in *Harlow v. Fitzgerald* 457 U.S. 800 (1982). The defenses of qualified immunity so long as the official's actions do not violate clearly established statutory or constitutional rights of which a reasonable person would have known. In my case it is clear that housing any female inmate on a men's unit is violation of The Fourteenth Amendment and in my case is violation of the

7

Americans with Disabilities Act. An extremely similar case to my in which prison officials were denied their qualified immunity defense, *see Greene v. Bowles,* 361 F.3d 290 (6th Cir. 2004) (a warden's knowledge that transgender women inmates was sufficient to raise a triable issue of fact as to whether the warden was deliberately indifferent to the safety of a transgendered inmate who was severely beaten by a fellow inmate while in protective custody. That warden knew the inmate's attacker posed a danger to others provided another basis for denying the warden's qualified immunity.)

### Argument Under the Prison Rape Elimination Act.

29. Although my claims under The Prison Rape Elimination Act of 2000, 42 U.S.C.§ 15601,et seq. may not create a private right of action it allows me to sufficiently assert the seriousness of my other claims. Also, it allows me to reference federal policies in which defendants are supposed to follow but have failed to do so, failure to follow these policies create a big part of my constitutional claims. I ask that the Courts allow my Prison Rape Elimination Act claims only for the purpose of supporting my other claims.

### CONCLUSION

30. For the foregoing reason, I request that the Court deny Defendants' Motion to Dismiss.

Dated: 8-28-20

Jennaya Bennett-Werra

Acting as pro se

ID#1902435

Suffolk County H.O.C.

20 Bradston st

Boston MA 02118

### CERIFICATE OF SERVICE

I, Jennaya Bennett-Werra, hereby certify that this document filed with the Court via mail will be sent via mail to all participants on September 1st, 2020.

*Jennayee Werra*